### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ALLEGHENY COUNTY EMPLOYEES' RETIREMENT SYSTEM, individually and on behalf of all others similarly situated,<br><br>     Plaintiff,<br><br>  v.<br><br>KARYOPHARM THERAPEUTICS INC., MICHAEL G. KAUFFMAN, SHARON SHACHAM, JUSTIN A. RENZ, MICHAEL F. FALVEY, GAREN G. BOHLIN, MIKAEL DOLSTEN, SCOTT GARLAND, BARRY E. GREENE, MANSOOR RAZA MIRZA, DEEPA R. PAKIANATHAN, KENNETH E. WEG, CANTOR FITZGERALD & CO., J.P. MORGAN SECURITIES LLC, JEFFERIES LLC, and LEERINK PARTNERS LLC,<br><br>     Defendants. | Civ. A. No. <u>1:19-cv-11597</u><br><br><u>**CLASS ACTION**</u><br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>JURY TRIAL DEMANDED</u> |

Plaintiff Allegheny County Employees' Retirement System ("Plaintiff"), by and through its counsel, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief are based upon, *inter alia*, counsel's investigation, which included review and analysis of: (a) regulatory filings made by Karyopharm Therapeutics Inc. ("Karyopharm" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (b) press releases, presentations, and media reports issued by and disseminated by the Company; (c) analyst and media reports concerning Karyopharm; and (d) other public information regarding the Company.

### INTRODUCTION

1.  This securities class action is brought on behalf of all persons or entities that: (1)

purchased shares of Karyopharm's common stock between March 2, 2017 and February 22, 2019, inclusive (the "Class Period"); (2) purchased Karyopharm shares in or traceable to the Company's public offering of common stock conducted on or around April 28, 2017 (the "2017 Offering"); or (3) purchased Karyopharm shares in or traceable to the Company's public offering of common stock conducted on or around May 7, 2018 (the "2018 Offering," and together with the 2017 Offering, the "Offerings").

2.      The claims asserted herein are alleged against Karyopharm and certain of the Company's Officers, Karyopharm's Board of Directors, including the directors that signed the Registration Statements for the Offerings, and the underwriters of the Offerings (collectively, "Defendants"), and arise under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"), and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, promulgated thereunder.

3.      Karyopharm is a clinical-stage pharmaceutical company focused on the development of drugs for the treatment of cancer.  During the Class Period, the Company's lead drug candidate was selinexor, which is intended for the treatment of various types of cancer, including principally blood cancers.   This matter arises from Defendants' material misrepresentations and omissions regarding results from clinical trials for selinexor's treatment of patients with certain types of blood cancer: the Phase 2 SOPRA trial ("SOPRA"), which evaluated selinexor for treatment of patients with acute myeloid leukemia ("AML"); and Part 2 of the Phase 2b STORM trial ("STORM"), which evaluated the safety and efficacy of selinexor in treating patients with multiple myeloma ("MM").

4.      The Class Period begins on March 2, 2017, when the Company reported interim results from the SOPRA study.  Specifically, the Company announced that the study did not reach

statistical significance for overall survival among AML patients, the study's primary endpoint, and, as a result, the Company halted the trial. Despite Karyopharm's decision to halt the trial, the Company assured investors that selinexor was "well-tolerated" by patients and explained that there were "no new clinically significant adverse events in the patients receiving selinexor." The Company also continued moving forward with the STORM study and repeatedly touted selinexor's safety profile.

5.      Throughout the Class Period, the Company continued to tout the commercial prospects for selinexor and consistently described selinexor as having a "predictable and manageable tolerability profile" and a "very nice safety profile," and assured investors that it was "well tolerated" by patients. Karyopharm also claimed that selinexor had the potential to be used as a new treatment for MM, with limited and manageable side effects. As a result of these misrepresentations, Karyopharm shares traded at artificially inflated prices during the Class Period.

6.      The truth was revealed on February 22, 2019, when, in advance of an FDA advisory committee meeting to review Karyopharm's New Drug Application ("NDA") for selinexor and assess the drug's risks and benefits, the FDA released a briefing document expressing serious concerns about the safety and efficacy of selinexor (the "FDA Report"). Significantly, the FDA Report revealed that, contrary to Karyopharm's assurances, the previously cancelled SOPRA trial had resulted in "worse overall survival" for AML patients treated with selinexor, which "highlight[ed] the toxicity of this drug." The FDA also determined that the toxicity observed with selinexor in AML patients in the SOPRA study was "similar" to that observed in MM patients in the STORM study. The FDA unambiguously concluded that "[t]reatment with selinexor is associated with significant toxicity" and has "limited efficacy."

7.     These disclosures caused the Company's stock price to decline from $8.97 per share to $5.07 per share, or more than 43%.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under Sections 11, 12(a)(2), and 15 of the Securities Act (15 U.S.C. §§ 77k, 77l, and 77o) and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).  This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

10.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d). Karyopharm maintains its headquarters in Newton, Massachusetts, which is situated in this District, conducts substantial business in this District, and many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

### A.     Plaintiff

11.     Plaintiff Allegheny County Employees' Retirement System is a single-employer defined benefit, contributory retirement benefit plan covering substantially all employees of the

County of Allegheny, Pennsylvania.  As of December 31, 2018, Plaintiff manages approximately $880 million in assets on behalf of approximately 12,300 participants.  As indicated on the certification submitted herewith, Plaintiff purchased Karyopharm common stock at artificially inflated prices during the Class Period and suffered damages as a result of the violations of the federal securities laws alleged herein.

### B.    Corporate Defendant

12.    Defendant Karyopharm is a Delaware corporation with its corporate headquarters located at 85 Wells Ave, 2nd Floor, Newton, Massachusetts.  The Company's common stock trades on The NASDAQ Global Select Market ("NASDAQ") under ticker symbol "KPTI."  As of April 30, 2019, Karyopharm had over 60 million shares of stock outstanding.

### C.    Officer Defendants

13.    Defendant Michael G. Kauffman ("Kauffman") is a co-founder of Karyopharm, has served as its Chief Executive Officer since January 2011, and has been a Director since the Company's founding in 2008.  Defendant Kauffman signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials (defined below) for the Offerings.

14.    Defendant Sharon Shacham ("Shacham") is a co-founder of Karyopharm, has served as its President since December 2013, and has been the Company's Chief Scientific Officer since October 2010.

15.    Defendant Justin A. Renz ("Renz") was an Executive Vice President of Karyopharm and served as the Company's Chief Financial Officer ("CFO") from August 18, 2014 until his resignation on April 3, 2017.  Mr. Renz continued to provide certain advisory and other consulting services to the Company until January 31, 2018. Defendant Renz signed the registration statement for the 2017 Offering is therefore liable under the Securities Act for the untrue and

misleading statements and omissions in the 2017 Offering Materials (defined below).

16.     Defendant Michael F. Falvey ("Falvey") was an Executive Vice President of Karyopharm and served as the Company's CFO and Treasurer from September 11, 2017 until January 18, 2019. Defendant Falvey signed the registration statement for the 2018 Offering and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the 2018 Offering Materials (defined below).

17.     Defendants Kauffman, Shacham, Renz, and Falvey are collectively referred to hereinafter as the "Officer Defendants."  The Officer Defendants, because of their positions with Karyopharm, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors.  Each of the Officer Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of the Officer Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

### D.     Director Defendants

18.     Defendant Garen G. Bohlin ("Bohlin") is, and was at all relevant times, a Director of Karyopharm.  Defendant Bohlin signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

19.     Defendant Mikael Dolsten ("Dolsten") is, and was at all relevant times, a Director of Karyopharm.  Defendant Dolsten signed the registration statements for the Offerings and is

therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

20.     Defendant Scott Garland ("Garland") is, and was at all relevant times, a Director of Karyopharm.  Defendant Garland signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

21.     Defendant Barry E. Greene ("Greene") is, and was at all relevant times, a Director of Karyopharm.  Defendant Greene signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

22.     Defendant Mansoor Raza Mirza ("Mirza") is, and was at all relevant times, a Director of Karyopharm.  Defendant Mirza signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

23.     Defendant Deepa R. Pakianathan ("Pakianathan") is, and was at all relevant times, a Director of Karyopharm.  Defendant Pakianathan signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

24.     Defendant Kenneth E. Weg ("Weg") served as a Director of Karyopharm from February 2013 until June 19, 2018.  Defendant Weg signed the registration statements for the Offerings and is therefore liable under the Securities Act for the untrue and misleading statements and omissions in the Offering Materials for the Offerings.

25.     Defendants Bohlin, Dolsten, Garland, Greene, Mirza, Pakianathan, and Weg are

collectively referred to hereinafter as the "Director Defendants."

      **E.**    **Underwriter Defendants**

      26.     Defendant Cantor Fitzgerald & Co. ("Cantor Fitzgerald") was the sole underwriter of the 2017 Offering as specified herein.  As an underwriter of the 2017 Offering, Cantor Fitzgerald was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2017 Offering Materials.

      27.     Defendant J.P. Morgan Securities LLC ("JP Morgan") was an underwriter and joint book-running manager of the 2018 Offering as specified herein.  As an underwriter of the 2018 Offering, JP Morgan was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2018 Offering Materials.

      28.     Defendant Jefferies LLC ("Jefferies") was an underwriter and joint book-running manager of the 2018 Offering as specified herein.  As an underwriter of the 2018 Offering, Jefferies was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2018 Offering Materials.

      29.     Defendant Leerink Partners LLC ("Leerink Partners") was an underwriter and joint book-running manager of the 2018 Offering as specified herein.  As an underwriter of the 2018 Offering, Leerink Partners was responsible for ensuring the truthfulness and accuracy of the various statements contained in or incorporated by reference into the 2018 Offering Materials.

      30.     Defendants Cantor Fitzgerald, JP Morgan, Jeffries, and Leerink Partners are collectively referred to hereinafter as the "Underwriter Defendants."

## **BACKGROUND**

      31.     Karyopharm is a clinical-stage pharmaceutical company focused on the discovery, development and commercialization of drugs for the treatment of cancer and other major diseases. During the Class Period, Karyopharm's lead drug candidate was selinexor, an oral selective

inhibitor of nuclear export for the treatment of cancer indications with significant unmet clinical need, initially to be used for the treatment of blood cancers.

32.     By early 2017, Karyopharm had been testing selinexor in various clinical trials for several cancer indications, including the SOPRA trial, which evaluated selinexor for the treatment of patients with AML, a type of blood cancer, and the STORM trial, which evaluated the safety and efficacy of selinexor in treating patients with MM, another type of blood cancer that forms in white blood cells.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS CAUSE SUBSTANTIAL LOSSES TO INVESTORS**

33.     The Class Period begins on March 2, 2017, when Karyopharm issued a press release announcing the results from an interim analysis of the SOPRA study and stating that the Company had halted the SOPRA trial because the study did not reach statistical significance for overall survival, its primary endpoint.  The press release stated that selinexor's "safety profile was as expected" and Defendant Kauffman expressed satisfaction that selinexor was "well-tolerated" by patients.  The press released also explained that there were "no new clinically significant adverse events in the patients receiving selinexor."

34.     The statements set forth above in ¶33 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experienced a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity. Furthermore, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.

Accordingly, selinexor was neither effective nor safe.

35.     On March 10, 2017, Karyopharm issued a press release announcing that the Company had received written notice from the FDA that all of Karyopharm's clinical trials for selinexor were placed on a partial clinical hold.  According to the press release, the partial clinical hold was due to incomplete information in the drug's brochure, and not the result of any patient death or any new information regarding the safety profile of selinexor.

36.     On March 16, 2017, Karyopharm issued a press release announcing its financial results for the fourth quarter and fiscal year ended December 31, 2016.  In the press release, which was also filed with the SEC on Form 8-K, the Company stated that analysis of the Phase 2 SOPRA study revealed that "selinexor demonstrated a safety profile consistent with previous studies."

37.     That same day, the Company also filed its annual report on Form 10-K for the year ended December 31, 2016 (the "2016 Form 10-K").  The 2016 Form 10-K was signed by Defendants Kauffman and Renz and contained certifications by them that attested to the purported accuracy and completeness of the 2016 Form 10-K.  In the 2016 Form 10-K, the Company stated that "selinexor has been sufficiently well-tolerated," which has allowed patients to remain on the drug for prolonged periods.  The 2016 Form 10-K also stated that "[t]o date, selinexor has been generally well tolerated, with adverse events that are responsive to standard supportive care and/or dose modification, often decrease over time, and are consistent with those previously reported in patients in our clinical trials."  In addition, the 2016 Form 10-K stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

38.     With respect to the SOPRA trial, the 2016 Form 10-K stated that the "study would

not reach statistical significance for showing superiority of [overall survival] on selinexor versus [overall survival] on [physician's choice of treatment], the study's primary endpoint" but there was "no new clinically significant [adverse events] in the patients receiving selinexor."

39.     That same day, Karyopharm held a conference call with analysts and investors to discuss the Company's earnings and operations, as well as its clinical update on selinexor.  During the conference call, Defendant Kauffman discussed "important safety findings from the SOPRA trial" and emphasized that the dosage of selinexor was "generally well tolerated."

40.     In response to an analyst's question regarding the results of the SOPRA study and how they could be interpreted for the other indications Karyopharm was pursuing, Defendant Kauffman expressed excitement that selinexor "is clearly very active" and that there is "very good activity [on] the drug."  Defendant Kauffman then touted the "safety side" of selinexor and noted that selinexor "has a very nice safety profile" even in patients that are as sick and as elderly as the patients in this AML study.

41.     Defendant Kauffman also addressed questions from analysts regarding the partial hold the FDA had imposed on clinical trials for selinexor.  Specifically, Defendant Kauffman stated that for selinexor "there is nothing new qualitatively on safety at all" and "there's just not anything really exciting or new coming out of our safety profile at all."  Defendant Kauffman assured analysts and investors that the Company is "very comfortable with the drug and there is nothing hidden or dramatic here."

42.     The statements set forth above in ¶¶36-41 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side

effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

43.     On March 30, 2017, the Company issued a press release announcing that the FDA had lifted the partial clinical hold on the clinical trials for selinexor, which enabled Karyopharm to resume patient enrollment and the dosing of new patients in the Company's clinical trials of selinexor in hematologic malignancies, including the STORM study in MM.  The press release stated that the FDA's partial clinical hold was "not the result of any patient death or any change in the safety profile of selinexor."

44.     On or around April 28, 2017, Karyopharm conducted a follow-on offering of common stock pursuant to a shelf registration statement that the Company filed with the SEC on November 7, 2016, and which the SEC declared effective on December 1, 2016 (the "2017 Offering Registration Statement").  The 2017 Offering Registration Statement was supplemented through a preliminary prospectus filed with the SEC on April 24, 2017, and a Prospectus Supplement filed with the SEC on April 26, 2017 (the "2017 Offering Prospectus Supplement"), both of which formed a part of the effective registration statement for the 2017 Offering.  The 2017 Offering Registration Statement and the 2017 Offering Prospectus Supplement are referred to herein collectively as the "2017 Offering Materials."  The 2017 Offering Registration Statement was signed by Defendants Kauffman and Renz and the Director Defendants.  As set forth in the 2017 Offering Prospectus Supplement, Karyopharm offered 3,902,439 shares of common stock plus an underwriters' over-allotment option for an additional 585,365 shares to be offered to the

public at $10.25 per share.

45.     The 2017 Offering Materials incorporated by reference the Company's 2016 Form 10-K.  For the reasons stated above, ¶¶37-38, the 2017 Offering Materials contained materially false and misleading statements and omissions.

46.     On May 4, 2017, the Company issued a press release announcing its financial results for the first quarter ended March 31, 2017.  According to the press release, which was also filed with the SEC on Form 8-K, the interim analysis of the Phase 2 SOPRA study showed "[s]elinexor demonstrated a safety profile consistent with previous studies with similar rates of sepsis and lower rates of febrile neutropenia in the selinexor arm versus the PC arm."

47.     That same day, Karyopharm filed with the SEC its Form 10-Q for the first quarter of 2017.  The Form 10-Q was signed by Defendant Kauffman and contained certifications by Defendant Kauffman that attested to the purported accuracy and completeness of the 10-Q.  The Form 10-Q stated that "selinexor has generally been well-tolerated by patients in our Phase 1 and Phase 2 clinical trials to date."  The Form 10-Q also stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

48.     The statements set forth above in ¶¶46-47 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death.  In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the

SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

49.    On August 8, 2017, Karyopharm filed with the SEC its Form 10-Q for the second quarter ended June 30, 2017.  The Form 10-Q was signed by Defendant Kauffman and contained certifications by Defendant Kauffman that attested to the purported accuracy and completeness of the 10-Q.  The Form 10-Q stated that "selinexor has generally been well-tolerated by patients in our Phase 1 and Phase 2 clinical trials to date."  The Form 10-Q also stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

50.    That same day, Karyopharm held a conference call with analysts and investors to discuss the Company's earnings and operations, as well as to provide a clinical update on selinexor. During the conference call, Defendant Kauffman touted "the emerging safety profile for selinexor" and stated that "selinexor continues to be well tolerated" in the Company's key trials, including STORM, with "[a]dverse events tend[ing] to be highly predictable and manageable with standard supportive care and/or dose modifications."

51.    The statements set forth above in ¶¶49-50 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the

SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

52.     On November 2, 2017, Karyopharm filed with the SEC its Form 10-Q for the third quarter ended September 30, 2017.  The Form 10-Q was signed by Defendants Kauffman and Falvey and contained certifications by them that attested to the purported accuracy and completeness of the 10-Q.  The Form 10-Q stated that "selinexor has generally been well-tolerated by patients in our Phase 1 and Phase 2 clinical trials to date."  The Form 10-Q also stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

53.     The statements set forth above in ¶52 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

54.     On March 15, 2018, Karyopharm filed its annual report on Form 10-K for the year ended December 31, 2017 (the "2017 Form 10-K").  The 2017 Form 10-K was signed by Defendants Kauffman and Falvey and contained certifications by them that attested to the

purported accuracy and completeness of the 2017 Form 10-K.  In the 2017 Form 10-K, the Company stated that "selinexor has been sufficiently well-tolerated" and has allowed patients to remain on therapy for prolonged periods.  The 2017 Form 10-K also stated that "[t]o date, selinexor has been generally well tolerated, with adverse events that are responsive to standard supportive care and/or dose modification, often decrease over time, and are consistent with those previously reported in patients in our clinical trials."  In addition, the 2017 Form 10-K stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

55.    With respect to the SOPRA trial, the 2017 Form 10-K stated that the "study would not reach statistical significance for showing superiority of [overall survival] on selinexor versus [overall survival] on [physician's choice of treatment], the study's primary endpoint" but there was "no new clinically significant [adverse events] in the patients receiving selinexor."

56.    The statements set forth above in ¶¶54-55 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death.  In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

57.    On April 30, 2018, Karyopharm issued a press release announcing data from its

Phase 2b STORM study evaluating selinexor in patients with MM.  The press release, which was also filed with the SEC on Form 8-K, stated that "[o]ral selinexor demonstrated a predictable and manageable tolerability profile, with safety results that were consistent with those previously reported from Part 1 of this study . . . and from other selinexor studies."  The Form 8-K also stated that "[a]s anticipated, the most common adverse events (AEs) were nausea, vomiting, fatigue and reduced appetite and were primarily low grade and manageable with standard supportive care and/or dose modification."

58.     The statements set forth above in ¶57 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

59.     On May 1, 2018, Karyopharm hosted a conference call with analysts and investors to discuss, what Defendant Kauffman described as, the "positive" and "very exciting" results from the Phase 2b STORM clinical data.  During the conference call, Defendant Kauffman stated that "we believe the results [from the STORM study] confirm that selinexor has the potential to be used . . . as a new treatment for patients with penta-refractory [MM]" and that "these data represent a significant step in establishing the efficacy and safety of selinexor as a new treatment option for patients with [MM]."  In response to an analyst's question, Defendant Kauffman stated that the

side effects of patients who took selinexor as part of their treatment in the STORM trial "w[eren't] really a major issue, which is great."

60.    The statements set forth above in ¶59 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

61.    On or around May 7, 2018, Karyopharm conducted a follow-on offering of common stock pursuant to a shelf registration statement that the Company filed with the SEC on January 26, 2018, and which, after an amendment filed by the Company on February 7, 2018, the SEC declared effective on February 14, 2018 (the "2018 Offering Registration Statement").  The 2018 Offering Registration Statement was signed by Defendants Kauffman and Falvey and the Director Defendants.  The 2018 Offering Registration Statement was supplemented through a preliminary prospectus filed with the SEC on May 1, 2018, and a Prospectus Supplement filed with the SEC on May 3, 2018 (the "2018 Offering Prospectus Supplement"), both of which formed a part of the effective registration statement for the 2018 Offering.  The 2018 Offering Registration Statement and the 2018 Offering Prospectus Supplement are referred to herein collectively as the "2018 Offering Materials," and the 2018 Offering Materials, together with the 2017 Offering Materials, are referred to herein collectively as the "Offering Materials."

62.     The 2018 Offering Materials incorporated by reference the Company's 2016 Form 10-K, 2017 Form 10-K, May 4, 2017 10-Q, August 8, 2017 10-Q, November 2, 2017 10-Q, and April 30, 2018 8-K.   For the reasons stated above in ¶¶37-38, 46, 49, 52, 54-55, 57, the 2018 Offering Materials contained materially false and misleading statements and omissions.

63.     In the 2018 Offering Materials, Defendants also represented that, with respect to the STORM study, "[o]ral selinexor demonstrated a predictable and manageable tolerability profile, with safety results that were consistent with those previously reported from Part 1 of this study and from other selinexor studies" and "[a]s anticipated, the most common adverse events (AEs) were nausea, vomiting, fatigue and reduced appetite and were primarily low grade and manageable with standard supportive care and/or dose modification."   The 2018 Offering Materials also stated that "[i]n light of this recognition that the STORM patient population represents an unmet clinical need and the positive top-line data reported on April 30, 2018, we believe that the STORM study should support our request to the FDA for accelerated approval."

64.     The statements set forth above in ¶63 were materially false and misleading.   In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.   As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.   In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.   Accordingly, selinexor was neither effective nor safe.

65.     On May 10, 2018, Karyopharm issued a press release announcing the Company's

financial results for the first quarter ended March 31, 2018.  In the press release, which was also

filed with the SEC on Form 8-K, Defendant Kauffman is quoted as stating that "[t]he positive top-

line data recently reported from the Phase 2b STORM study . . . are an important step forward

toward the approval of selinexor."  According to the press release, "[o]ral selinexor demonstrated

a predictable and manageable tolerability profile" and "[s]afety results were consistent with those

previously reported from Part 1 of this study and from other selinexor studies and no new safety

signals were identified."

66.     That same day, the Company also filed with the SEC its Form 10-Q for the first

quarter of 2018.  The Form 10-Q was signed by Defendants Kauffman and Falvey and contained

certifications by them attesting to the purported accuracy and completeness of the 10-Q.  The 10-

Q stated that Karyopharm planned to submit an NDA to the FDA, with a request for accelerated

approval for selinexor as a new treatment for patients with penta-refractory MM "as a result of our

positive outcome" from the STORM study.  The Form 10-Q stated that "selinexor has generally

been well-tolerated by patients in our clinical trials to date."  The 10-Q also stated that "[a] small

percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and

"[a] small percentage of patients across our clinical trials have experienced serious adverse events

. . . related to selinexor."

67.     That same day, Karyopharm also held a conference call with analysts and investors

to discuss the Company's earnings and operations, as well as to highlight recent progress on the

development of selinexor.  During the conference call, Defendant Kauffman stated that "[o]ral

selinexor demonstrated a predictable and manageable safety tolerability profile, consistent with

that previously reported from part 1 of the STORM study and from other selinexor studies."

Defendant Kauffman also highlighted that "[n]o new safety signals were identified" and that

"adverse effects were often reversible, transient and manageable with dose modification and/or standard supportive care." In addition, Defendant Kauffman touted that the Company was "extremely enthusiastic about the data" from the STORM study and "believe[s] these data are great news for all our stakeholders."

68.     The statements set forth above in ¶¶65-67 were materially false and misleading. In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event. As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity. In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study. Accordingly, selinexor was neither effective nor safe.

69.     One June 20, 2018, Karyopharm filed a Form 8-K with the SEC, attaching a copy of a slide presentation that "will be used by representatives of [Karyopharm] in connection with investor meetings and presentations from time to time." A slide on the presentation titled "Selinexor: A Growing Body of Safety Data" states that selinexor had a "favorable [e]merging tolerability profile" and that dosing regimens of selinexor used in key studies, including the STORM study, have shown "generally predictable and manageable tolerability." According to the presentation, "[c]ommon side effects are generally predictable … and generally reversible and/or manageable with standard supportive care." The slide also states that "[c]ombination regimens have demonstrated a predictable and manageable tolerability profile, with observed additive or synergistic activity." That presentation also presented data from the Phase 2b STORM study.

Specifically, the presentation states that, with respect to safety, selinexor has a "[p]redictable and manageable tolerability profile" and "[a]s anticipated, the most common non-hematologic [adverse events] were fatigue, nausea, reduced appetite, and weight loss" and were "primarily low grade and manageable with standard supportive care and/or dose modification."  The slide goes on to state that "[n]o new safety signals" were observed in the study.  The presentation also states that selinexor "demonstrated robust activity in penta-refractory myeloma."

70.    The statements set forth above in ¶69 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death.  In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

71.    On July 18, 2018, Karyopharm issued a press release announcing that the Company had initiated rolling submission of its NDA to the FDA for selinexor as a treatment for patients with MM.  In the press release, Defendant Shacham is quoted as saying that "[w]e believe that selinexor has the potential to address the critical unmet need for patients with highly resistant, penta-refractory [MM], where the disease is no longer responsive to standard approved therapies" and "[w]e are proud of the positive Phase 2b STORM study results underlying this application."

72.    The statements set forth above in ¶71 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant

toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

73.     On August 7, 2018, Karyopharm issued a press release, which was also filed with the SEC on Form 8-K, announcing the Company's financial results for the second quarter ended June 30, 2018.  In the press release, Defendant Kauffman is quoted as saying that the Company has "made tremendous progress toward advancing [Karyopharm's] lead drug candidate, selinexor and "[t]he positive results from the Phase 2b STROM study . . . demonstrated that treatment with selinexor may result in an important clinical benefit" for patients with penta-refractory [MM]." The press release also touted the "positive top-line results" from the STORM study.  According to the press release, "side effects of oral selinexor were generally predictable and often managed with dose adjustments or supportive care" and "[s]afety results were consistent with those previously reported from Part 1 of this study and from other selinexor studies and no new safety signals were identified."  In the press release, Defendant Kauffman is also quoted as saying that the Company is "making excellent progress in advancing commercial preparation for the potential launch of selinexor in the U.S."

74.     That same day, Karyopharm held a conference call with analysts and investors to discuss the Company's earnings and operations as well highlight recent progress on selinexor. During the conference call, Defendant Kauffman touted the Company's "tremendous progress

advancing our lead selinexor program" and described its first NDA seeking accelerated approval for selinexor as a treatment of MM as "an important achievement for both Karyopharm and for patients battling this difficult-to-treat cancer."   Defendant Kauffman also stated that, on the commercial front, the Company has been "making exciting progress building our commercial infrastructure in preparation for the first potential selinexor product launch in the U.S." and informed investors that the Company's regulatory and commercial initiatives surrounding selinexor were "supported by the positive top-line results" from the STORM study.   Specifically, Defendant Kauffman stated that "[o]n the safety front, oral selinexor demonstrated a predictable and manageable tolerability profile consistent with that previously reported, . . . with no new safety signals identified."   Defendant Kauffman went on to further tout the performance of selinexor, and stated that "the adverse effects were often reversible, transient, and manageable with dose modification and/or standard supportive care."   Defendant Kauffman also stated that "we are extremely pleased with the significant progress made to date in 2018, including the submission of our first NDA for selinexor, and we're excited about the key upcoming milestones we expect to achieve."

75.    That same day, the Company also filed with the SEC its Form 10-Q for the second quarter of 2018.  The Form 10-Q was signed by Defendants Kauffman and Falvey and contained certifications by them that attested to the purported accuracy and completeness of the 10-Q.  In the Form 10-Q, the Company stated that it had previously completed its rolling submission of an NDA to the FDA with a request for accelerated approval of selinexor as a new treatment for patients with penta-refractory MM "as a result of our positive outcome" from the STORM study.   The Form 10-Q also stated that "selinexor has generally been well-tolerated by patients in our clinical trials to date."  The Form 10-Q further stated that "[a] small percentage of patients have withdrawn

from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

76.     The statements set forth above in ¶¶73-75 were materially false and misleading. In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

77.     On September 13, 2018, Karyopharm issued a press release announcing updated and additional clinical data from the Phase 2b STORM study.  The press release, which was also filed with SEC on Form 8-K the following day, described the clinical results from the STORM study as "very encouraging" and stated that selinexor "provided the opportunity for a meaningful clinical benefit for patients on the STORM study."  In the press release, Defendant Shacham is quoted as saying that the overall response rate from the STORM study is "particularly meaningful" and that the "results reinforce the potential of selinexor in this difficult to treat patient population." The press release described the side effects of selinexor as "generally predictable and often managed with dose adjustments or supportive care, with safety results that were consistent with those previously reported from Part 1 of this study . . . and from other selinexor studies."

78.     The statements set forth above in ¶77 were materially false and misleading.  In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant

toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event. As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity. In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study. Accordingly, selinexor was neither effective nor safe.

79.     On October 5, 2018, Karyopharm issued a press release, which was also filed with the SEC on Form 8-K on September 9, 2018, announcing that the FDA had accepted the Company's NDA for selinexor and granted priority review. In the press release, Defendant Shacham is quoted as saying that "[a]s a potential new therapy with a novel mechanism and compelling clinical profile, we believe oral selinexor, if approved, will provide a meaningful therapeutic option for patients battling highly resistant, penta-refractory [MM]."

80.     The statements set forth above in ¶79 were materially false and misleading. In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event. As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity. In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study. Accordingly, selinexor was neither effective nor safe.

81.     On November 8, 2018, Karyopharm issued a press release, which was also filed

with the SEC on Form 8-K, announcing its financial results for the third quarter ended September 30, 2018.  In the press release, Defendant Kauffman is quoted as saying that "we believe that [selinexor's] novel mechanism or action and oral administration, along with its compelling clinical profile, will make it a meaningful treatment option for patients with highly refractory [MM]."  The press release also described the side effects of selinexor as "generally predictable manageable with does adjustments and/or supportive care, with safety results that were consistent with those previously reported from Part 1 of this study … and from other selinexor studies."

82.     That same day, Karyopharm held a conference call with analysts and investors to discuss the Company's earnings and operations as well as to highlight recent progress on the development of selinexor.  During the conference call, Defendant Kauffman stated that "[i]f approved, we believe that selinexor's novel mechanism of action, oral administration and compelling clinical profile will make it a meaningful treatment option for patients with highly refractory [MM]."  Defendant Kauffman went on to say that the Company's "NDA and MAA packages are supported by positive results from part 2 of the Phase IIb STORM study."  Defendant Kauffman stated that "[s]ide effects of oral selinexor were generally predictable and manageable with dose adjustments and our supportive care, with safety results that were consistent with those previously reported from Part 1 of the STORM study and from other selinexor studies."

83.     The Company also filed with the SEC its Form 10-Q for the third quarter of 2018.  The Form 10-Q was signed by Defendants Kauffman and Falvey and contained certifications by them that attested to the purported accuracy and completeness of the 10-Q.  In the Form 10-Q, the Company stated that it had previously completed its rolling submission of an NDA to the FDA with a request for accelerated approval of selinexor as a new treatment for patients with penta-refractory MM "as a result of our positive outcome" from the STORM study.  The Form 10-Q

stated that "selinexor has generally been well-tolerated by patients in our clinical trials to date." The 10-Q also stated that "[a] small percentage of patients have withdrawn from our clinical trials as a result of [adverse events]" and "[a] small percentage of patients across our clinical trials have experienced serious adverse events . . . related to selinexor."

84.     The statements set forth above in ¶¶81-83 were materially false and misleading. In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, more than a "small percentage" of patients experienced serious drug-related side effects, with eighty percent of the AML patients treated with selinexor trial experiencing a serious adverse event. As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity. In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study. Accordingly, selinexor was neither effective nor safe.

85.     On January 7, 2019, Defendant Kauffman represented Karyopharm at the JP Morgan Global Healthcare Conference. During the conference Defendant Kauffman stated that "[o]ur safety data [from the STORM trial] showed no new safety findings at all." Defendant Kauffman also described selinexor as "a first-in class novel oral lead compound with demonstrated single-agent activity in patients, whose disease is refractory to available therapies. You can take this drug at home . . . and the side effects are all supportable and reversible."

86.     The statements set forth above in ¶85 were materially false and misleading. In truth, data from the SOPRA trial demonstrated that selinexor was associated with significant toxicity, was not well-tolerated among patients with AML, and resulted in a higher risk of death. In addition, patients experienced serious drug-related side effects, with eighty percent of the AML

patients treated with selinexor trial experiencing a serious adverse event.  As a result, nearly half of the AML patients were forced to withdraw from the SOPRA trial because of drug-related toxicity.  In addition, the toxicity profile of selinexor for the treatment of patients with MM in the STORM study was similar to that observed in AML patients treated with selinexor in the SOPRA study.  Accordingly, selinexor was neither effective nor safe.

## THE TRUTH EMERGES

87.     The truth was first disclosed on February 22, 2019, when, in advance of an advisory committee meeting to review Karyopharm's NDA for selinexor, the FDA released a briefing document expressing serious concerns about the safety and efficacy of selinexor.  Significantly, the FDA Report revealed, for the first time, that "[t]reatment with selinexor was associated with significant toxicity" and that the benefit to patients with MM was "difficult to isolate."

88.     According to the FDA, data from the previously halted SOPRA study—which the Company did not disclose to investors—revealed that the median overall survival rate of the AML patients treated with selinexor was 94 days compared to 170 days for patients treated with a physician's choice of other treatment.  Indeed, according to the FDA, there was an 18 percent higher risk of death among the patients who took selinexor than those that did not.  FDA staff concluded that in the SOPRA trial, in which AML patients were randomized to receive selinexor or a physician's choice of other treatment, "there was worse overall survival in the selinexor arm, highlighting the toxicity of this drug."  The FDA determined that, in the SOPRA study, a staggering 80 percent of the AML patients treated with selinexor experienced a serious adverse side effect and nearly half of the patients had to leave the clinical trial because they could not tolerate the drug-related toxicity.  Shockingly, the FDA found that the toxicity observed with selinexor in AML patients in the SOPRA study was "similar" to that observed in MM patients in the STORM study.

89.     The FDA Report also provided data from Part 2 of the STORM trial that was contradicted Defendants' Class Period statements about selinexor.  Notably, the FDA Report stated that 23 deaths occurred on or within 30 days of study treatment, and 10 of those deaths were due to a fatal treatment-emergent adverse event ("TEAE").   Furthermore, every patient who participated in the STORM trial experienced at least one TEAE, 93.5% of patients experienced at least one severe TEAE, and nearly two-thirds of patients experienced at least one serious adverse event.  According to the FDA's analysis, the vast majority of patients required a dose modification due to a TEAE and over one-quarter of patients permanently discontinued their study treatment because of a TEAE.  The FDA further noted that nearly two-thirds of patients who responded to the treatment achieved only a partial response.   The FDA unambiguously concluded that "[t]reatment with selinexor is associated with significant toxicity" and has "limited efficacy."

90.     As a result of the disclosures in the FDA Report, the Company's stock price declined by more than 43% from its closing price of $8.97 per share on February 21, 2019 to a closing price of $5.07 per share on February 22, 2019, on unusually high trading volume.

## LOSS CAUSATION

91.     During the Class Period, as detailed herein, Defendants made materially false and misleading statements and omissions, and engaged in a scheme to deceive the market.  This artificially inflated the price of Karyopharm's common stock and operated as a fraud or deceit on the Class.   Later, when Defendants' prior misrepresentations and fraudulent conduct were disclosed to the market, the price of Karyopharm's stock fell precipitously, as the prior artificial inflation came out of the price over time.  As a result of their purchases of Karyopharm's securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

92.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired: (1) the publicly traded common stock of Karyopharm during the Class Period; (2) common stock in or traceable to the Company's 2017 Offering; and (3) common stock in or traceable to the Company's 2018 Offering (the "Class").  Excluded from the Class are Defendants and their families, directors, and officers of Karyopharm and their families and affiliates.

93.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  As of April 30, 2019, Karyopharm had over 60 million shares of common stock outstanding, owned by hundreds or thousands of investors.

94.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether Defendants violated the Securities Act and/or the Exchange Act;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether the Officer Defendants and the Director Defendants are personally liable for the alleged misrepresentations and omissions described herein;

(e)   Whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

(f)   Whether Defendants' conduct impacted the price of Karyopharm common stock;

(g)   Whether Defendants' conduct caused the members of the Class to sustain damages; and

(h)   The extent of damage sustained by Class members and the appropriate measure of damages.

95.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

96.     Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

97.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Joinder of all Class members is impracticable.

## INAPPLICABILITY OF STATUTORY SAFE HARBOR

98.     Karyopharm's "Safe Harbor" warnings accompanying its forward-looking statements issued during the Class Period were ineffective to shield those statements from liability.

99.     Defendants are also liable for any false or misleading forward-looking statements pleaded herein because, at the time each such statement was made, the speaker knew the statement was false or misleading and the statement was authorized and/or approved by an executive officer of Karyopharm who knew that the statement was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to, or stated to be dependent on, those historic or present tense statements when made.

## PRESUMPTION OF RELIANCE

100.     At all relevant times, the market for Karyopharm's common stock was an efficient market for the following reasons, among others:

(a)     Karyopharm common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     As a regulated issuer, Karyopharm filed periodic public reports with the SEC and NASDAQ;

(c)     Karyopharm regularly and publicly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Karyopharm was followed by several securities analysts employed by major brokerage firm(s) who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firm(s).  Each of these reports was publicly available and entered the public marketplace.

101.    As a result of the foregoing, the market for Karyopharm common stock promptly digested current information regarding Karyopharm from all publicly available sources and reflected such information in the price of Karyopharm common stock.  Under these circumstances, all purchasers of Karyopharm common stock during the Class Period suffered similar injury through their purchase of Karyopharm common stock at artificially inflated prices and the presumption of reliance applies.

102.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the results of a

clinical trials of the Company's lead drug candidate—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the clinal trial results to the approval of selinexor and Karyopharm's subsequent commercialization of the drug, and the impact that could have on the Company's future revenue generation, that requirement is satisfied here.

## COUNT I

**For Violations of Section 11 of the Securities Act Against All Defendants (except Shacham)**

103.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of all members of the Class who purchased or otherwise acquired Karyopharm common stock sold pursuant or traceable to the Offerings, and who were damaged thereby.

104.   This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 11 claim.

105.   Liability under this Count is predicated on the Officer Defendants (except for Shacham) and the Director Defendants signing of the registration statements for the Offerings, and all Defendants' (except for Shacham) respective participation in the Offerings, which were conducted pursuant to the Offering Materials. The Offering Materials were false and misleading, contained untrue statements of material facts, omitted to state facts necessary to make the statements not misleading, and omitted to state material facts required to be stated therein.

106.   Less than one year has elapsed since the time that Plaintiff discovered, or could

reasonably have discovered, the facts upon which this Complaint is based. Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

107.    By reason of the foregoing, the Defendants named in this Count are each jointly and severally liable for violations of Section 11 of the Securities Act to Plaintiff and the other members of the Class pursuant to Section 11(e).

## COUNT II

**For Violations of Section 12(a)(2) of the Securities Act Against the Underwriter Defendants**

108.    This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. § 77l(a)(2), on behalf of all members of the Class who purchased or otherwise acquired Karyopharm common stock in and/or traceable to the Offerings and who were damaged thereby.

109.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act. For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 12(a)(2) claim.

110.    Defendant Cantor Fitzgerald was a statutory seller of Karyopharm common stock that was registered in the 2017 Offering pursuant to the 2017 Offering Registration Statement and sold by means of the 2017 Offering Materials. The Underwriter Defendants (except for Defendant Cantor Fitzgerald) were statutory sellers of Karyopharm common stock that were registered in the 2018 Offering pursuant to the 2018 Registration Statement and sold by means of the 2018 Offering Materials. By means of the Offering Materials, the Underwriter Defendants sold millions of shares of stock through the Offerings to members of the Class. The Underwriter Defendants were at all relevant times motivated by their own financial interests. In sum, the Underwriter Defendants

were sellers, offerors, and/or solicitors of sales of the common stock that was sold in the Offerings by means of the materially false and misleading Offering Materials.

111.    The Offering Materials contained untrue statements of material fact and omitted other facts necessary to make the statements not misleading, and failed to disclose material facts, as set forth herein.

112.    Less than one year has elapsed since the time that Plaintiff discovered, or could reasonably have discovered, the facts upon which this Complaint is based.  Less than three years has elapsed since the time that the securities at issue in this Complaint were bona fide offered to the public.

113.    By reason of the foregoing, the Underwriter Defendants are liable for violations of Section 12(a)(2) of the Securities Act to Plaintiff and the other members of the Class who purchased common stock in or traceable to the Offerings, and who were damaged thereby.

**COUNT III**

**For Violations of Section 15 of the Securities Act Against
the Officer Defendants and the Director Defendants**

114.    This Count is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of all members of the Class who purchased or otherwise acquired Karyopharm common stock sold pursuant or traceable to the Offerings, and who were damaged thereby.

115.    This Count expressly excludes and disclaims any allegation that could be construed as alleging fraud or intentional or reckless conduct, as this Count is solely based on claims of strict liability and/or negligence under the Securities Act.  For purposes of asserting this Count, Plaintiff does not allege that Defendants acted with scienter or fraudulent intent, which are not elements of a Section 15 claim.

116.    As set forth in Count One above, Karyopharm is strictly liable under Section 11 of

the Securities Act for untrue statements and omissions of material fact in the Offering Materials.

117.    The Officer Defendants and Director Defendants, by virtue of their positions, voting power, ownership, rights as against Karyopharm, and/or specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Karyopharm within the meaning of Section 15 of the Securities Act.  These Defendants also had the power and influence, and exercised the same, to cause Karyopharm to engage in the acts described herein, including by causing Karyopharm to conduct the Offerings pursuant to the Offering Materials.

118.    By reason of the foregoing, the Officer Defendants and Director Defendants are liable for the aforesaid wrongful conduct and are liable, to the same extent that Karyopharm is liable under Section 11 of the Securities Act, to members of the Class who purchased or otherwise acquired Karyopharm common stock sold pursuant or traceable to the Offerings, and who were damaged thereby.

## **COUNT IV**

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against
Karyopharm and the Officer Defendants**

119.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

120.    During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Karyopharm common stock at artificially inflated prices.

121.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which

operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Karyopharm common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

122.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial well-being, operations, and prospects.

123.    During the Class Period, Defendants made the false statements specified above, which they knew or recklessly disregarded to be false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

124.    Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them. Defendants engaged in this misconduct to conceal Karyopharm's true condition from the investing public and to support the artificially inflated prices of the Company's common stock.

125.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Karyopharm common stock.  Plaintiff and the Class would not have purchased the Company's common stock at the prices they paid, or at all, had they been aware that the market prices for Karyopharm common stock had been artificially inflated by Defendants' fraudulent course of conduct.

126.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period.

127.    By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## COUNT V

**For Violations of Section 20(a) of the Exchange Act Against the Officer Defendants**

128.    Plaintiff repeats, incorporates, and realleges each and every allegation set forth above as if fully set forth herein.

129.    The Officer Defendants acted as controlling persons of Karyopharm within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions, participation in and/or awareness of the Company's operations, direct involvement in the day-to-day operations of the Company, and/or intimate knowledge of the Company's actual performance, and their power to control public statements about Karyopharm, the Officer Defendants had the power and ability to control the actions of Karyopharm and its employees.  By reason of such conduct, the Officer Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

130.    WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

     D.     As to the claims set forth under the Securities Act, awarding rescission or a recessionary measure of damages; and

     E.     Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## **JURY DEMAND**

131.    Plaintiff demands a trial by jury.

July 23, 2019

**BLOCK & LEVITON LLP**

/s/ Jacob A. Walker
Jeffrey C. Block (BBO #600747)
Jacob A. Walker (BBO #688074)
260 Franklin Street, Suite 1860
Boston, MA 02110
Telephone: (617) 398-5600
Facsimile:  (617) 507-6020
jeff@blockesq.com
jake@blockesq.com

*Liaison Counsel for Plaintiff*

**BERNSTEIN LITOWITZ BERGER
  & GROSSMANN LLP**

Hannah Ross, *pro hac vice* forthcoming
Avi Josefson, *pro hac vice* forthcoming
Michael D. Blatchley, *pro hac vice* forthcoming
1251 Avenue of the Americas
New York, NY 10020
Telephone: (212) 554-1400
Facsimile:  (212) 554-1444
hannah@blbglaw.com
avi@blbglaw.com
michaelb@blbglaw.com

*Counsel for Plaintiff*

---

**Certificate of Service**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the NEF (NEF) and paper copies will be sent to those indicated as non-registered participants on July 23, 2019.

     /s/ Jacob A. Walker

---